1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (#190264)
2  CRAIG W. SMITH (#164886)
   SHANE P. SANDERS (#237146)
3  GINA STASSI (#261263)
   600 B Street, Suite 1900
4  San Diego, CA 92101
   Telephone: (619) 525-3990
5  Facsimile: (619) 525-3991
   brobbins@robbinsarroyo.com
6  csmith@robbinsarroyo.com
   ssanders@robbinsarroyo.com
7  gstassi@robbinsarroyo.com

8  STEPHENS & STEPHENS LLP
   CONRAD B. STEPHENS (#266790)
9  505 South McClelland Street
   Santa Maria, CA 93454
10 Telephone: (805) 922-1951
   Facsimile: (805) 922-8013
   conrad@stephensfirm.com

11 Attorneys for Plaintiff

12 [Additional Counsel on Signature Page]

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                     WESTERN DIVISION

16 IGNACIO MORENO, Derivatively on   )  Case No.
   Behalf of DREAMWORKS              )
   ANIMATION SKG, INC.,              )  VERIFIED SHAREHOLDER
17                                    )  DERIVATIVE COMPLAINT FOR
                       Plaintiff,     )  BREACH OF FIDUCIARY DUTY,
18                                    )  WASTE OF CORPORATE ASSETS,
         v.                           )  AND UNJUST ENRICHMENT
19                                    )
   JEFFREY KATZENBERG, LEWIS W.       )
20 COLEMAN, RICHARD E. SULLIVAN,      )
   MICHAEL J. MONTGOMERY,            )
21 HARRY M. BRITTENHAM, JASON         )
   KILAR, MELLODY HOBSON,            )
22 THOMAS E. FRESTON, LUCIAN          )
   GRAINGE, and HEATHER              )
23 O'CONNOR,                          )
                                      )
24                    Defendants,     )
                                      )
25      -and-                         )
                                      )
26 DREAMWORKS ANIMATION SKG,          )
   INC., a Delaware corporation,      )
27                                    )
               Nominal Defendant.     )
28 _____  )  DEMAND FOR JURY TRIAL

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant DreamWorks Animation SKG, Inc. ("DreamWorks" or the "Company") against certain of its officers and directors for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in damage to DreamWorks' reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     This case arises out of the defendants' responsibility for the Company's false and misleading statements, including these statements' complete and utter failure to adhere to U.S. Generally Accepted Accounting Principles ("GAAP"). In particular, defendants issued improper statements regarding DreamWorks' business prospects and financial results by failing to timely write-down the Company's 2013 animated film *Turbo*. *Turbo*, one of only two movies the Company produced in 2013, was a massive disappointment for the Company. The film grossed only $83 million at the domestic box office and just $282.6 million worldwide, while costing $127 million to produce, and as much as another $175 million to market. Notwithstanding its lackluster performance, however, it was not until February 2014 that the Company announced a $13.5 million write-down for the *Turbo* film.

3.     The Company's write-down was late compared to its own standards, and even more unacceptable when compared to other peer companies in its industry. In stark contrast to the Company's seven month delay to write-down *Turbo*, DreamWorks' most recent box-office failure, *Mr. Peabody and Sherman*, opened in March 2014 and received a $57 million write-down only one month later in April 2014. Similarly, *Rise of the Guardians*, which opened in November 2012, absorbed an $87 million write-down three months later in February 2013. The Walt Disney Company ("Disney") took a $200 million write-down on *John Carter* just ten days after its opening in March 2012.

4.      Moreover, instead of acknowledging *Turbo's* failure and appropriately adjusting the revenues and future cash flows that were expected from the film after the write-down, defendants continued to present an overstated image of the Company's financial health and business prospects through July 2014.  In particular, defendants assured the market that Twentieth Century Fox Film Corporation ("Fox"), the Company's distributor, would recoup its distribution costs and DreamWorks would finally start reporting revenue from *Turbo*.

5.      Then on July 29, 2014, during a conference call with analysts, defendants revealed that DreamWorks is being investigated by the U.S. Securities and Exchange Commission ("SEC") in connection with the Company's $13.5 million write-down. Further, during the conference call, defendants disclosed that Fox had still not recouped its distribution costs in connection with *Turbo*, finally revealing that the Company did not expect to receive any revenues from the film.

6.      The revelations concerning the Company's write-down of one of only two movies it produced in 2013, the SEC's investigation, and Fox's inability to recoup its costs exposed DreamWorks' true business health and caused its market capitalization to plunge 43%, erasing more than $1.1 billion in value.  As a direct result of the defendants' wrongdoing, the Company is now the subject of at least two federal securities class action lawsuits filed in the U.S. District Court for the Central District of California.  The securities class actions pose the risk of hundreds of millions of dollars in damages to the Company in addition to the costs and liability the Company is already facing in the SEC investigation.

7.      While *Turbo's* delayed write-down sent the Company into a whirlwind of litigation and investigation, it allowed defendant Jeffrey Katzenberg ("Katzenberg"), the Company's Chief Executive Officer ("CEO"), to save $1.24 million on his tax bill.   In particular, the late write-down allowed defendant Katzenberg's withheld shares to precede

1   *Turbo's* impairment charge and the stock dive precipitated by its announcement.[1]  This

2   would not have been the case had DreamWorks announced *Turbo's* write-down within

3   the usual time frame such impairments are taken.

4        8.     Plaintiff now brings this action against the Individual Defendants to repair

5   the harm that they caused the Company and prevent future wrongdoing.

6                              **JURISDICTION AND VENUE**

7        9.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the

8   parties exists and the amount in controversy exceeds $75,000, exclusive of interest and

9   costs.

10       10.     This Court has jurisdiction over each defendant named herein because each

11   defendant is either a corporation that conducts business in and maintains operations in

12   this District, or is an individual who has sufficient minimum contacts with this District to

13   render the exercise of jurisdiction by the District courts permissible under traditional

14   notions of fair play and substantial justice.

15       11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the

16   Company is headquartered in this District; (ii) a substantial portion of the transactions

17   and wrongs complained of herein, including defendants' primary participation in the

18   wrongful acts detailed herein had an impact on this District; and (iii) defendants have

19   received substantial compensation in this District by doing business here and engaging in

20   numerous activities that had an effect in this District.

21                                 **THE PARTIES**

22   **Plaintiff**

23       12.     Plaintiff Ignacio Moreno was a shareholder of DreamWorks at the time of

24   the continuing wrong complained of, and has been a shareholder since January 24, 2014.

25   The continuing wrong included: (i) the issuance of improper statements regarding the

26   Company's business prospects; and (ii) the implementation of inadequately designed

27

28   [1] Withheld shares refer to the stock awards that DreamWorks withheld to cover defendant
   Katzenberg's tax obligations.

1    financial and disclosure controls for the Company. Once plaintiff became a shareholder,

2    he has continuously been a shareholder. Plaintiff is a citizen of Florida.

3 **Nominal Defendant**

4        13.     Nominal Defendant DreamWorks is a Delaware corporation with principal

5    executive offices located at 1000 Flower Street, Glendale, California. Accordingly,

6    DreamWorks is a citizen of Delaware and California. DreamWorks produces animated

7    feature films, television series and specials, live entertainment properties, and related

8    consumer products. The Company generates the majority of its revenue through its

9    distributors' worldwide exploitation of feature films in theaters and post-theatrical

10   markets. DreamWorks also licenses and merchandizes films and characters around the

11   world. As of August 2014, DreamWorks has released a total of twenty-nine animated

12   films, including the franchise properties of *Shrek*, *Madagascar*, *Kung Fu Panda*, and

13   *How to Train Your Dragon*. *Turbo* was one of only two animated movies the Company

14   produced in 2013.

15 **Defendants**

16        14.     Defendant Katzenberg is DreamWorks' CEO and a director and has been

17   since October 2004. Defendant Katzenberg is named as a defendant in securities class

18   action complaints that allege he violated sections 10(b) and 20(a) of the Securities

19   Exchange Act of 1934 ("Exchange Act"). Defendant Katzenberg knowingly, recklessly,

20   or with gross negligence: (i) made improper statements in the Company's press releases

21   and public filings concerning the Company's business prospects; (ii) caused the Company

22   to fail to implement adequate internal controls and procedures to ensure the accuracy of

23   the Company's disclosures; and (iii) failed to maintain reliable systems of financial

24   controls to ensure compliance with GAAP. DreamWorks paid defendant Katzenberg the

25   following compensation as an executive:

26

27

28

| Defendant | Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|-----------|------|--------|--------------|----------------------------------------|------------------------|-------|
| Katzenberg | 2013 | $2,500,000 | $4,499,954 | $6,000,000 | $483,248 | $13,483,202 |

Defendant Katzenberg is a citizen of California.

15.     Defendant Lewis W. Coleman ("Coleman") is DreamWorks' Chief Financial Officer ("CFO") and has been since February 2007; Vice Chairman and has been since August 2014; acting Chief Accounting Officer and has been since June 2014; and director and has been since December 2006. Defendant Coleman was DreamWorks' President from December 2005 to August 2014. Defendant Coleman is named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Effective September 15, 2014, defendant Coleman will step down as DreamWorks' CFO.     Defendant Coleman knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) failed to maintain reliable systems of financial controls to ensure compliance with GAAP. DreamWorks paid defendant Coleman the following compensation as an executive:

| Defendant | Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|-----------|------|--------|-------|--------------|------------------------|-------|
| Coleman | 2013 | $2,000,000 | $108,333 | $999,997 | $38,010 | $3,146,340 |

Defendant Coleman is a citizen of California.

16.     Defendant Richard E. Sullivan ("Sullivan") is Deputy CFO of DreamWorks and has been since October 2012. Defendant Sullivan was Head of Corporate Finance of DreamWorks from 2008 to October 2012 and Head of Investor Relations from 2005 to

1  2008.  Defendant Sullivan is named as a defendant in a securities class action complaint
2  that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant
3  Sullivan knowingly, recklessly, or with gross negligence: (i) made improper statements in
4  the Company's press releases and public filings concerning the Company's business
5  prospects; (ii) caused the Company to fail to implement adequate internal controls and
6  procedures to ensure the accuracy of the Company's disclosures; and (iii) failed to
7  maintain reliable systems of financial controls to ensure compliance with GAAP.
8  Defendant Sullivan is a citizen of California.

9        17.    Defendant Michael J. Montgomery ("Montgomery") is a DreamWorks
10 director and has been since July 2006.  Defendant Montgomery is also Chairman of
11 DreamWorks' Audit Committee and has been since at least April 2013.  Defendant
12 Montgomery knowingly or recklessly: (i) made improper statements in the Company's
13 press releases and public filings concerning the Company's business prospects; (ii)
14 reviewed and approved improper statements in the Company's public filings concerning
15 the Company's business prospects; (iii) caused the Company to fail to implement
16 adequate internal controls and procedures to ensure the accuracy of the Company's
17 disclosures; and (iv) failed to maintain reliable systems of financial controls to ensure
18 compliance with GAAP.  DreamWorks paid defendant Montgomery the following
19 compensation as a director:

| Defendant | Fiscal Year | Stock Awards | Total |
|---|---|---|---|
| Montgomery | 2013 | $224,982 | $224,982 |

23 Defendant Montgomery is a citizen of California.

24       18.    Defendant Harry M. Brittenham ("Brittenham") is a DreamWorks director
25 and has been since May 2008.  Defendant Brittenham is also a member of DreamWorks'
26 Audit Committee and has been since at least April 2013.  Defendant Brittenham
27 knowingly or recklessly: (i) reviewed and approved improper statements in the
28 Company's public filings concerning the Company's business prospects; (ii) caused the

- 6 -

Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) failed to maintain reliable systems of financial controls to ensure compliance with GAAP.  DreamWorks paid defendant Brittenham the following compensation as a director:

| Defendant | Fiscal Year | Stock Awards | Total |
|---|---|---|---|
| Brittenham | 2013 | $199,989 | $199,989 |

Defendant Brittenham is a citizen of California.

19.     Defendant Jason Kilar ("Kilar") is a DreamWorks director and has been since May 2013.  Defendant Kilar is also a member of DreamWorks' Audit Committee and has been since May 2013.  Defendant Kilar knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects; (ii) reviewed and approved improper statements in the Company's public filings concerning the Company's business prospects; (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iv) failed to maintain reliable systems of financial controls to ensure compliance with GAAP.  DreamWorks paid defendant Kilar the following compensation as a director:

| Defendant | Fiscal Year | Stock Awards | Total |
|---|---|---|---|
| Kilar | 2013 | $199,989 | $199,989 |

Defendant Kilar is a citizen of California.

20.     Defendant Mellody Hobson ("Hobson") is Chairman of the Board of Directors ("Board") of DreamWorks and has been since October 2012 and a director and has been since October 2004.  Defendant Hobson knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and

1  (iii) failed to maintain reliable systems of financial controls to ensure compliance with

2  GAAP.  DreamWorks paid defendant Hobson the following compensation as a director:

| Defendant | Fiscal Year | Stock Awards | Total |
|-----------|-------------|--------------|-------|
| Hobson | 2013 | $399,999 | $399,999 |

6  Defendant Hobson is a citizen of Illinois.

7      21.    Defendant Thomas E. Freston ("Freston") is a DreamWorks director and has

8  been since September 2007.  Defendant Freston knowingly or recklessly: (i) made

9  improper statements in the Company's press releases and public filings concerning the

10  Company's business prospects; (ii) caused the Company to fail to implement adequate

11  internal controls and procedures to ensure the accuracy of the Company's disclosures; and

12  (iii) failed to maintain reliable systems of financial controls to ensure compliance with

13  GAAP.  DreamWorks paid defendant Freston the following compensation as a director:

| Defendant | Fiscal Year | Stock Awards | Total |
|-----------|-------------|--------------|-------|
| Freston | 2013 | $199,989 | $199,989 |

17  Defendant Freston is a citizen of New York.

18      22.    Defendant Lucian Grainge ("Grainge") is a DreamWorks director and has

19  been since May 2013.  Defendant Grainge knowingly or recklessly: (i) made improper

20  statements in the Company's press releases and public filings concerning the Company's

21  business prospects; (ii) caused the Company to fail to implement adequate internal

22  controls and procedures to ensure the accuracy of the Company's disclosures; and (iii)

23  failed to maintain reliable systems of financial controls to ensure compliance with GAAP.

24  DreamWorks paid defendant Grainge the following compensation as a director:

| Defendant | Fiscal Year | Stock Awards | Total |
|-----------|-------------|--------------|-------|
| Grainge | 2013 | $199,989 | $199,989 |

28  Defendant Grainge is a citizen of California.

23. Defendant Heather O'Connor ("O'Connor") was DreamWorks' Chief Accounting Officer from February 2010 to May 2014. Defendant O'Connor was also DreamWorks' Head of SEC Reporting and Technical Accounting Research from January 2006 to February 2010. On May 22, 2014, just three months after the late write-down of *Turbo*, the Company announced the abrupt resignation of defendant O'Connor. Defendant O'Connor knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) failed to maintain reliable systems of financial controls to ensure compliance with GAAP. Defendant O'Connor is a citizen of California.

24. The defendants identified in ¶¶14-16, 23 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶14-15, 17-22 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17-19 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶14-23 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

25. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe DreamWorks and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DreamWorks in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of DreamWorks and not in furtherance of their personal interest or benefit.

26. To discharge their duties, the officers and directors of DreamWorks were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties,

the officers and directors of DreamWorks were required to, among other things:

(a)     devise and maintain a system of financial controls sufficient to ensure DreamWorks compliance with GAAP;

(b)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's current and future business prospects;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how DreamWorks conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

27.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of DreamWorks, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

28.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of DreamWorks, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, DreamWorks has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

29.    In addition to the general duties discussed above, under its Charter, the Audit Committee Defendants, defendants Montgomery, Brittenham, and Kilar, owed specific duties to DreamWorks to assist the Board in overseeing the Company's compliance with legal and regulatory requirements, monitoring the integrity of the Company financial statements, and policing the Company's internal controls and procedures.   These additional duties are delegated to the Audit Committee Defendants because they are touted as having a heightened financial literacy.   In particular, the Audit Committee Charter states that each member has the ability to read and understand fundamental financial statements, that each member is an "audit committee financial expert" as defined by the rules and regulations of the SEC, and that at least one member meets the financial sophistication standard required by The NASDAQ Stock Market.

## BACKGROUND

30.    DreamWorks is an animation studio engaged in the development and production of animated films and their associated characters worldwide.   The Company generates the majority of its revenue through its distributors' worldwide exploitation of feature films in theaters and post-theatrical markets.

31.    Films produced by DreamWorks were formerly being distributed worldwide by Paramount Pictures Corporation.    However, in 2013, Fox took over distribution of DreamWorks films as part of a five-year deal.

32.    The terms of the Fox distribution agreement provided that Fox would pay all marketing and distribution costs and collect an 8% distribution fee on each film it distributed.   The distribution agreement was set up such that DreamWorks would not begin reporting revenue on any film it produced until Fox had recouped its distribution costs.

33.    In the summer of 2013, the Company released *Turbo*. *Turbo,* one of only two animated films the Company produced in 2013, is about a snail given super-speed powers who then races in the famous Indianapolis 500-Mile Race.  The film grossed $83

1  million at the domestic box office when it was released, and $282.6 million worldwide.
2  Due to the costs involved in producing, marketing, and distributing the film, this box
3  office total was actually a massive disappointment for the Company.  In particular, *Turbo*
4  cost $127 million to produce, and as much as another $175 million to market.
5  Notwithstanding *Turbo's* poor performance, however, it was not until February 2014 that
6  the Company announced a $13.5 million write-down for the film.[2]  Defendants employed
7  improper accounting practices by failing to recognize a write-down for *Turbo* in a timely
8  manner.

9       34.    Moreover, instead of acknowledging *Turbo's* failure for DreamWorks and
10  Fox and re-evaluating the revenues and future cash flows that were expected from the
11  film after the write-down, defendants continued to present an overstated image of the
12  Company's financial health and business prospects.  Defendants' improper accounting
13  practices, however, were short lived, and only postponed the market's realization of the
14  Company's true business health.  Even worse, these accounting improprieties would
15  backfire on the defendants and would force the Company to become the subject of an
16  investigation by the SEC.

17                    **DREAMWORKS' GAAP VIOLATIONS**

18       35.    Throughout the relevant period, the Individual Defendants represented that
19  the Company's financial statements were presented in conformity with GAAP. These
20  representations were improper when made because the Individual Defendants, in
21  violation of GAAP and SEC rules, knowingly or recklessly employed improper
22  accounting and disclosure practices that materially misstated the financial results and
23  position of DreamWorks.

24

25

---

26  [2] The Company's February 2014 write-down for *Turbo* was less than the difference
27  between its costs and box office revenues because the film could still generate revenue
    for the Company through other means, such as home video sales, consumer products, and
28  licenses.

**Applicable Regulations and Violations**

36.     Financial statements filed with the SEC are required to be in accordance with GAAP.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

37.     Defendants violated GAAP and SEC rules because the Company did not timely write-down its *Turbo* movie.  Unamortized film costs are required to be tested for impairment whenever events or changes in circumstances indicate that the fair value of the film may be less than its unamortized costs.  As the Company explains in its own financial statements, it "evaluates its film and other inventory costs to determine whether the unamortized capitalized costs of any titles have a fair value that is less than its carrying value."

38.     Notwithstanding the fact that it purportedly evaluated its assets for necessary impairments, DreamWorks waited seven months to finally take a write-down for *Turbo*. Seven months is too slow compared to the Company's own standards, and even slower compared to other peer companies in the industry.  For example, DreamWorks' most recent box-office failure, *Mr. Peabody and Sherman*, opened in March 2014 and received a $57 million write-down only one month later in April 2014.  Similarly, *Rise of the Guardians*, which opened in November 2012, absorbed an $87 million write-down three months later in February 2013.  Disney took a $200 million write-down on *John Carter* just ten days after its opening in March 2012.

39.     Whereas the late write-down damaged the Company and caused it to become the subject of an SEC investigation, defendant Katzenberg benefited from the delay.  As part of a pre-existing vesting schedule of a prior stock award, 41,390 DreamWorks shares were withheld from defendant Katzenberg on two occasions in October and November 2013.  These were shares of stock that DreamWorks withheld in order to cover defendant

1   Katzenberg's tax obligations.  By delaying the write-down of *Turbo* seven months,

2   defendant Katzenberg saved $1.24 million on his tax bill because his withheld shares did

3   not suffer the significant drop in stock price that occurred after the announcement of the

4   write-down.  This would not have been the case had DreamWorks announced *Turbo's*

5   write-down within the usual time frame such impairments are taken.

6   **Improper Statements**

7       40.     By failing to timely write-down its *Turbo* movie, defendants manipulated

8   DreamWorks' earnings and financial position presented in various public statements

9   disseminated to the market.  Defendants' improper statements began on October 29, 2013,

10  when DreamWorks issued a press release reporting its financial results for the third

11  quarter of 2013.  The press release emphasized in its title that "Revenue From Feature

12  Film Segment Drives Strong Third Quarter Earnings."   The press release also stated in

13  pertinent part that "*Turbo*, which was released theatrically on July 17, 2013, ha[d]

14  reached $82.7 million at the domestic box office and $163.5 million at the international

15  box office for a worldwide gross of $246.2 million to date," and that "*Turbo*

16  contributed feature film revenue of $6.4 million to the third quarter."  The press release

17  was improper because it failed to take into account that the Company was employing

18  improper accounting practices, particularly with respect to its timing for recognizing a

19  write-down for *Turbo*.  The press release stated, in part:

20          *Turbo*, which was released theatrically on July 17, 2013, has reached $82.7

21          million at the domestic box office and $163.5 million at the international

22          box office for a worldwide gross of $246.2 million to date.  *Turbo*

23          contributed feature film revenue of $6.4 million to the third quarter.

24       41.     During the earnings conference call held later that evening with

25  investors and analysts, defendants made additional positive comments about the

26  Company's ongoing business metrics and financial prospects.  Defendants Katzenberg

27  and Coleman both emphasized that *Turbo* was still on track to be a profitable movie for

28  DreamWorks, stating, in pertinent part, as follows:

[**Defendant Katzenberg:**] I'd like to begin with a few comments about our feature films, which remain at the core of our business, and **continue to drive new areas of growth for the company**. Looking back at our most recent theatrical event, **Turbo**, which was released on July 17th, has now reached $83 million at the domestic box office, and $163 million internationally, bringing its worldwide total to $246 million. **During the third quarter, it debuted in a majority of its international markets opening at number one in 32 territories. It is now among the top dozen animated films of all time in China, Korea and Venezuela and has recently opened successfully in a number of European markets, where it will continue to play into the fourth quarter**. Based on the information we have today, **we believe Turbo is a profitable movie**.

\* \* \*

[**Defendant Coleman:**] … As expected, Turbo remained in an unrecouped position with Fox at the end of the third quarter. However, it did contribute revenue of approximately $6.4 million, primarily from its theatrical performance in China and South Korea, where it was not distributed by Fox. **Based on our current expectations, we believe that Turbo was a profitable film on an ultimate basis**. However, this assumes successful performance in home video and other markets, including consumer products.

42.     On October 30, 2013, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2013. The Form 10-Q was signed by defendant Coleman. In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Katzenberg and Coleman, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The Form 10-Q suggested that Turbo would be a profitable movie for DreamWorks by stating that Fox, the Company's distributor, was still on track to recoup its marketing and

distribution cost for the movie.  The Form 10-Q was improper because it failed to take
into account that the Company was employing improper accounting practices, particularly
with respect to its timing for recognizing a write-down for *Turbo*.  Moreover, the Form
10-Q was improper because it overstated *Turbo's* expected profits.  The Form 10-Q
stated, in part:

> *Current year theatrical releases.* **Revenues generated by our "Current
> year theatrical release" category decreased $34.7 million, or 76.9%, during
> the three months ended September 30, 2013** when compared to the three
> months ended September 30, 2012. *Madagascar 3* (our June 2012 release)
> was a stronger-performing title than our original film *Turbo* (our July 2013
> release).   During the three months ended September 30, 2013,  *Turbo*
> contributed  $6.4 million,  or  4.1%,  of revenues, **primarily earned in the
> Chinese and South Korean theatrical markets, which are distributed outside
> of our arrangement with Fox**. During the three months ended September 30,
> 2013, **Fox did not report any revenue to us for Turbo as they had not
> yet recouped their marketing and distribution costs, largely as a result of
> Turbo's box office performance.   We anticipate that Fox will recoup
> their marketing and distribution costs from their future on-going
> distribution of Turbo in the theatrical and post-theatrical markets
> covered by the Fox Distribution Agreement**.   Our distributors in the
> Chinese and South Korean theatrical markets recouped their distribution and
> marketing costs during the three months ended September 30, 2013, **as their
> respective costs relative to Turbo's theatrical performance in their specific
> distribution territories are lower relative to the costs incurred by Fox in
> other territories**.

43.     On February 25, 2014, the Company issued a press release announcing its
fourth quarter and fiscal 2013 financial results.  The press release stated that the
"Company's fourth quarter 2013 results included an impairment charge of $13.5 million,

1   or a loss of approximately $0.12 cents of earnings per share on a fully diluted basis, related to

2   the *Turbo* feature film." This was the first time the Company mentioned the $13.5 million

3   write-down for *Turbo*, which was not conducted in a timely fashion. The press release

4   stated, in part:

5   **The Company's fourth quarter 2013 results included an impairment**

6   **charge of $13.5 million**, or a loss of approximately $0.12 cents of

7   earnings per share on a fully diluted basis, related to the Turbo feature film,

8   as a result of its performance during the last two months of the quarter.

9   * * *

10   *Turbo,* which was released theatrically on July 17, 2013, reached $282.6

11   million at the worldwide box office. The film contributed feature film

12   revenue of $1.6 million in the quarter. *Turbo* was released into the

13   domestic home entertainment market on November 12, 2013. The film

14   reached an estimated 3.3 million home entertainment units sold worldwide

15   through the end of the fourth quarter, net of actual and estimated future

16   returns.

17   44.   During the earnings conference call held later that evening with investors and

18   analysts, certain of the defendants discussed the impairment charge. In particular,

19   defendants Coleman and Katzenberg adamantly defended the calculation of the *Turbo*

20   impairment charge, even stating that the valuation was "conservative." Moreover,

21   defendant Coleman emphasized that Fox would recoup its distribution costs "after the

22   first quarter 2014," which in turn meant that the Company would finally report revenue

23   from *Turbo*. The conference call went as follows:

24   [**Defendant Coleman:**] As Jeffrey mentioned, at the end of the fourth quarter,

25   we revised our estimates [of] Turbo's ultimate revenues and future net cash

26   flows and recorded a film-related impairment charge of approximately $14

27   million, or $0.12 of earnings per share on a fully diluted basis. ***Our***

28   ***revised   ultimate   took   into   account   lower   than   previously   expected***

- 17 -

*performance in international theatrical markets and worldwide home entertainment markets.* In addition to the impairment, we recorded approximately $4 million of amortization expense in the quarter related to Turbo.

\* \* \*

Turbo contributed approximately $2 million of revenue to the quarter from territories where it was not theatrically distributed by [Fox]. *We expect that [Fox] will recoup their costs related to Turbo after the first quarter 2014.* Due to Turbo's high amortization rate, we expect it to have an immaterial impact on 2014 operating income.

\* \* \*

[Analyst:] Yes, hi guys. One question for Lew [Coleman]. Lew … the write-down on Turbo was pretty thin. I'm actually somewhat surprised you took it [at] all. I don't want to say it's [a] rounding error, but I mean $14 million is just pretty thin overall, especially just given kind of the little boost in box office we saw kind of at the beginning of the quarter. I mean, is it possible you take a write-up here sometime in the future as the film sort of cycles through – maybe you get a longer tail on DVD or maybe the film performs better on international pay TV or the free TV windows, or was all that factored into the current ultimate? Thanks a lot.

[Defendant Katzenberg:] … I'm going to preempt on this one and just say, what we are doing is based on the information that we have today and the experience that we have, this is what we believe to be the case. And yes, maybe it's a small number, but it is the facts as we know them today and it's not a rounding error for us and I don't think we should treat these things as rounding errors. *We, frankly, rather be a bit more conservative and totally transparent about this.*

45.     On February 26, 2014, the Company filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2013.  The Form 10-K was signed by defendants Katzenberg, Coleman, O'Connor, Hobson, Freston, Grainge, Kilar, and Montgomery.   In addition, the Form 10-K contained SOX certifications signed by defendants Katzenberg and Coleman, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The Form 10-K was improper because the $13.5 million write-down for *Turbo* was not conducted in a timely fashion.  As such, the financial results for 2013 presented in the Form 10-K were overstated.  The Form 10-K stated, in relevant part:

> Due to Turbo's performance in the international theatrical market during the last two months of the quarter ended December 31, 2013, ***we recorded an impairment charge totaling $13.5 million (of which $11.9 million and $1.6 million was allocated to the Feature Film and Consumer Products segments, respectively)***. Further discussion is provided in the section entitled "—Overview of Financial Results— Costs of Revenues."
>
> *         *         *
>
> **Critical Accounting Policies and Estimates**
>
> *         *         *
>
> ***Film and Other Inventory Costs Amortization***
>
> *         *         *
>
> We may also from time to time observe indicators of impairment subsequent to a film's initial worldwide theatrical release, such as lower-than-expected performance in home entertainment and other post-theatrical markets, which result in a reduction in our estimate of a film's Ultimate Revenues and may result in an impairment of the film in periods following its initial theatrical release. For example, *Turbo* (initially released in July 2013 in the domestic theatrical market) underperformed in

the domestic theatrical market, but, due to our then-current estimates of remaining net cash flows for all remaining markets, we concluded that it was not impaired as of September 30, 2013 (the quarter of initial domestic release). However, as a result of the weak international theatrical performance of *Turbo* (which caused us to also revise downward our estimates of future revenues in other post-theatrical markets) during the last two months of the quarter ended December 31, 2013, we recorded an impairment charge of $13.5 million on the film during such quarter. As of December 31, 2013, our remaining capitalized film production costs with respect to *Turbo* were approximately $101.4 million.

**The impairment charge recognized for Turbo takes into consideration, among other things, our estimate of future revenues. Due to the nature of our distribution arrangement with Fox, a significant portion of these future revenues are known to us, even though they have not been recognized in our financial results as of December 31, 2013.** Similarly, as a result of fixed arrangements and minimum guarantees that we have in place with respect to television distribution and consumer products licensing arrangements, there are other revenue streams that are essentially known to us even though they have not yet been recognized in our financial results. However, we may experience a further impairment of *Turbo's* remaining carrying costs if the uncertain components of our future revenues (e.g., those related to international home entertainment sales and some consumer products licensing activity) do not materialize as currently expected. A reduction of 10% in our estimated future revenues would result in an additional impairment charge of approximately $5 million to $10 million. Conversely, if our future revenues are greater than currently estimated, our future amortization rate with respect to *Turbo's* remaining capitalized costs would be reduced.

* * *

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

* * *

**Film and Other Inventory Costs**

* * *

*The Company evaluates its film and other inventory costs to determine whether the unamortized capitalized costs of any titles have a fair value that is less than its carrying value.* Refer to Note 2 for a description of the Company's accounting policy related to evaluating film and other inventory costs for impairment. *During the years ended December 31, 2013 and 2012, the Company performed fair value analysis to determine whether the unamortized film inventory costs for certain of its titles were impaired as a result of the lower-than-expected performance of the titles.* Key assumptions used in the fair value measurements were discount rates ranging from 7% to 11% and estimated remaining cash flows over a period of approximately 10 years. As a result of the analysis, during the years ended December 31, 2013 and 2012, the Company recorded impairment charges totaling $20.2 million (of which $13.5 million related to *Turbo*) and $89.3 million (of which $86.9 million related to *Rise of the Guardians*), respectively, resulting in remaining carrying value totaling $102.3 million and $71.0 million as of December 31, 2013 and 2012, respectively. A change in the discount rate of 1.0% would change the fair value measurements by $1.7 million and $1.3 million for the years ended December 31, 2013 and 2012, respectively. No impairment charges were recorded on film and other inventory costs during the year ended December 31, 2011.

46.     On April 29, 2014, the Company issued a press release announcing its financial and operating results for the first quarter ended March 31, 2014. Net loss was

- 21 -

$42.94 million, or $0.51 per diluted share, on revenues of $147.24 million, compared to net income of $5.58 million or $0.07 per diluted share on revenues of $134.65 million for the same period in the prior year.  The press release stated, in part:

> *Turbo* contributed feature film revenue of $22.3 million to the first quarter, primarily from domestic pay television. The film reached an estimated 4.8 million home entertainment units sold worldwide through the end of the first quarter, net of actual and estimated future returns.

47.    On April 30, 2014, the Company filed its Quarterly Report on Form 10-Q with the SEC which was signed by defendant Coleman, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained SOX certifications signed by defendants Katzenberg and Coleman, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

### REASONS THE STATEMENTS WERE IMPROPER

48.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that as a result of the material underperformance of *Turbo* internationally and in home entertainment, coupled with its failed domestic launch and extraordinarily high marketing costs, Fox would not recoup its distribution costs and *Turbo* would not be profitable for DreamWorks;

(b)    that because *Turbo* was not going to be profitable for DreamWorks, the Company was required to but did not take a timely impairment charge on the film assets held on its inventory; and

(c)    the Company lacked adequate internal controls over financial reporting.

49.   Moreover, the Company's announced financial results were in violation of the following principles:

(a)   the principle that "[f]inancial reporting should provide information that is useful to present [to] potential investors and creditors and other users in making rational investment, credit, and similar decisions" Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(b)   the principle that "[f]inancial reporting should provide information about the economic resources of an enterprise, the claims to those resources, … and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, ¶40);

(c)   the principle that "[f]inancial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, ¶42);

(d)   the principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" (FASB Statement of Concepts No. 1, ¶50);

(e)   the principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59); and

(f)   the principle of completeness, meaning that "nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions" (FASB Statement of Concepts No. 2, ¶79).

## THE TRUTH IS REVEALED

50.   The truth behind the Company's business health and the Individual Defendants' wrongdoing finally emerged on July 29, 2014.  On that day, during an earnings conference call with investors and analysts, defendants revealed that the Company was under investigation by the SEC for the $13.5 million write-down it took in

- 23 -

February 2014, in relation to the poor performance of *Turbo*. The Company indicated that it is cooperating with the SEC, but would not elaborate on the scope of the extent of the investigation. Further, during the conference call, defendants disclosed that Fox, the Company's distributor, had still not recouped its distribution costs in connection with *Turbo*, eliminating any remaining hopes about the film's profitability. As such, defendants' previous assurances regarding Fox recouping its costs and *Turbo's* expected profits for the Company were all improper. During the conference call, defendant Sullivan stated:

> *Turbo* contributed revenue of $11 million to the quarter, and reached an estimated 5.1 million net home entertainment units sold worldwide. As a reminder, the amortization rate for Turbo is significantly higher than a typical film – typical DreamWorks original film. ***Therefore, depending on its future performance, including in consumer products and licensing, we do not expect to generate a material amount of gross profit in the future***.

## DAMAGES TO DREAMWORKS

51.   As a result of the Individual Defendants' improprieties, DreamWorks disseminated improper, public statements concerning its business prospects. These improper statements have devastated DreamWorks' credibility as reflected by the Company's over $1.1 billion, or 43%, market capitalization loss.

52.   The Individual Defendants' statements also damaged the Company's reputation within the business community and in the capital markets. In addition to price, DreamWorks' potential customers and partners consider a company's trustworthiness and stability. Businesses are less likely to award contracts and enter into partnership agreements with companies that lie to their investors or are uncertain about their own financial conditions. Also, DreamWorks' ability to raise equity capital or debt on favorable terms in the future is now impaired. The Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and

1   lending money to the Company.

2       53.   Further, as a direct and proximate result of the Individual Defendants'

3   actions, DreamWorks has expended, and will continue to expend, significant sums of

4   money.  Such expenditures include, but are not limited to:

5           (a)   costs incurred from defending and paying any settlement in the class

6   actions for violations of federal securities laws;

7           (b)   costs in incurred from cooperating with the SEC's investigation;

8           (c)   costs incurred from paying any fine or settlement to the SEC; and

9           (d)   costs incurred from compensation and benefits paid to the defendants

10  who have breached their duties to DreamWorks.

11  **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

12      54.   Plaintiff brings this action derivatively in the right and for the benefit of

13  DreamWorks to redress injuries suffered, and to be suffered, by DreamWorks as a direct

14  result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as

15  well as the aiding and abetting thereof, by the Individual Defendants.  DreamWorks is

16  named as a nominal defendant solely in a derivative capacity.  This is not a collusive

17  action to confer jurisdiction on this Court that it would not otherwise have.

18      55.   Plaintiff will adequately and fairly represent the interests of DreamWorks in

19  enforcing and prosecuting its rights.

20      56.   Plaintiff was a shareholder of DreamWorks at the time of the continuing

21  wrong complained of.  Once plaintiff became a shareholder, he has continuously been a

22  shareholder.

23      57.   The current Board of DreamWorks consists of the following eight

24  individuals: defendants Katzenberg, Hobson, Coleman, Brittenham, Freston, Grainge,

25  Kilar, and Montgomery.  Plaintiff has not made any demand on the present Board to

26  institute this action because such a demand would be a futile, wasteful, and useless act, as

27  set forth below.

28

**Demand Is Excused Because a Majority of the Current Board Faces a Substantial Likelihood of Liability for Their Misconduct**

58.    As discussed above, defendants Katzenberg and Coleman, as the Company's CEO and CFO, respectively, made and certified improper statements in the Company's financial statements. Accordingly, demand is rendered futile as to defendants Katzenberg and Coleman.

59.    Defendants Montgomery, Brittenham, and Kilar were members of the Audit Committee during the relevant period of the wrongdoing and as such, breached their fiduciary duty of loyalty by causing or allowing the improper accounting and resulting improper statements discussed herein. Defendants Montgomery, Brittenham, and Kilar, as members of the Audit Committee, are held to higher standards of financial expertise. Furthermore, defendants Montgomery, Brittenham, and Kilar were classified by the Board as "audit committee financial expert[s]" as the term is defined in the SEC's rules and regulations. The Audit Committee's Charter provides that it is responsible for assisting the Board in monitoring the quality and integrity of the Company's financial statements. Defendants Montgomery, Brittenham, and Kilar face a substantial likelihood of liability for failing to adhere to their duties as members of the Audit Committee, rendering any demand upon them futile.

60.    Defendants Katzenberg, Hobson, Coleman, Brittenham, Freston, Grainge, Kilar, and Montgomery breached their duty of loyalty by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. As a result of defendants Katzenberg, Hobson, Coleman, Brittenham, Freston, Grainge, Kilar, and Montgomery's course of conduct, the Company is now the subject of at least two securities class action lawsuits and an SEC investigation.

61.    In addition to facing a substantial likelihood of liability for making the improper statements discussed herein, defendant Katzenberg is financially interested in the wrongdoing. As detailed above, defendant Katzenberg was the biggest beneficiary of the Company's delayed write-down, which saved him $1.24 million on his tax bill.

1   Accordingly, defendant Katzenberg cannot impartially consider a demand.

2       62.     The acts complained of constitute violations of the fiduciary duties owed by
3   DreamWorks' officers and directors and these acts are incapable of ratification.

4       63.     DreamWorks has been and will continue to be exposed to significant losses
5   due to the wrongdoing complained of herein, yet the Individual Defendants and current
6   Board have not filed any lawsuits against themselves or others who were responsible for
7   that wrongful conduct to attempt to recover for DreamWorks any part of the damages
8   DreamWorks suffered and will suffer thereby.

9       64.     Plaintiff has not made any demand on the other shareholders of
10  DreamWorks to institute this action since such demand would be a futile and useless act
11  for at least the following reasons:

12          (a)     DreamWorks is a publicly held company with over 84.6 million
13  common shares outstanding and thousands of shareholders;

14          (b)     making demand on such a number of shareholders would be
15  impossible for plaintiff who has no way of finding out the names, addresses, or phone
16  numbers of shareholders; and

17          (c)     making a demand on all shareholders would force plaintiff to incur
18  excessive expenses, assuming all shareholders could be individually identified.

19                                  **COUNT I**

20      **Against the Individual Defendants for Breach of Fiduciary Duty**

21      65.     Plaintiff incorporates by reference and realleges each and every allegation
22  contained above, as though fully set forth herein.

23      66.     The Individual Defendants owed and owe DreamWorks fiduciary
24  obligations.  By reason of their fiduciary relationships, the Individual Defendants owed
25  and owe DreamWorks the highest obligation of good faith, fair dealing, loyalty, and due
26  care.

27      67.     Each of the Individual Defendants violated and breached their fiduciary
28  duties.  More specifically, the Individual Defendants violated their duty of loyalty by

1  creating a culture of lawlessness within DreamWorks, and/or consciously failing to
2  prevent to Company from engaging in the unlawful acts complained of herein.

3        68.   Defendants Durham, Katzenberg, Coleman, Sullivan, and O'Connor, as
4  Officer Defendants, knowingly, recklessly, or with gross negligence: (i) made improper
5  statements in the Company's press releases and public filings concerning the Company's
6  business prospects; (ii) caused the Company to fail to implement adequate internal
7  controls and procedures to ensure the accuracy of the Company's disclosures; and (iii)
8  failed to maintain reliable systems of financial controls to ensure compliance with GAAP.

9        69.   The Director Defendants, defendants Katzenberg, Coleman, Montgomery,
10  Brittenham, Kilar, Hobson, Freston, and Grainge, as directors of the Company, owed
11  DreamWorks the highest duty of loyalty.  The Director Defendants knowingly or
12  recklessly breached their duty of loyalty by: (i) reviewing and approving improper
13  statements in the Company's public filings concerning the Company's business prospects;
14  (ii) causing the Company to fail to implement adequate internal controls and procedures
15  to ensure the accuracy of the Company's disclosures; and (iii) failing to maintain reliable
16  systems of financial controls to ensure compliance with GAAP.

17        70.   The Audit Committee Defendants, defendants Montgomery, Brittenham, and
18  Kilar breached their fiduciary duty of loyalty by approving the statements described
19  herein that were made during their tenure on the Audit Committee, which they knew or
20  were reckless in not knowing were improper.  The Audit Committee Defendants
21  completely and utterly failed in their duty of oversight, and defendants Montgomery,
22  Brittenham, and Kilar failed in their duty to appropriately review financial results, as
23  required by the Audit Committee Charter in effect at the time.

24        71.   As a direct and proximate result of the Individual Defendants' breaches of
25  their fiduciary duties, DreamWorks has sustained substantial damages, including direct
26  monetary damages and damages to its reputation and goodwill in the capital markets. As
27  a result of the misconduct alleged herein, the Individual Defendants are liable to the
28  Company.

72.   Plaintiff, on behalf of DreamWorks, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

73.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74.   As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in cooperating with the SEC investigation and defending itself in the securities class actions that the Individual Defendants brought on with their improper statements.  In addition, the Individual Defendants have caused DreamWorks to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

75.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

76.   Plaintiff, on behalf of DreamWorks, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

77.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of DreamWorks. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to DreamWorks.

79.   Plaintiff, as a shareholder and representative of DreamWorks, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

80.   Plaintiff, on behalf of DreamWorks, has no adequate remedy at law.

1    **PRAYER FOR RELIEF**

2    WHEREFORE, plaintiff, on behalf of DreamWorks, demands judgment as

3    follows:

4    A.    Against all of the defendants and in favor of the Company for the amount of

5    damages sustained by the Company as a result of the defendants' breaches of fiduciary

6    duty, waste of corporate assets, and unjust enrichment;

7    B.    Directing DreamWorks to take all necessary actions to reform and improve

8    its corporate governance and internal procedures to comply with applicable laws and to

9    protect DreamWorks and its shareholders from a repeat of the damaging events described

10   herein, including, but not limited to, putting forward for shareholder vote, resolutions for

11   amendments to the Company's By-Laws or Articles of Incorporation and taking such

12   other action as may be necessary to place before shareholders for a vote of the following

13   Corporate Governance Policies:

14   1.    a proposal to strengthen the Company's accounting controls,

15   including remediating the material weaknesses in its internal controls for recognizing

16   timely write-downs;

17   2.    a proposal to implement mandatory GAAP training programs for

18   members of the Company's Audit Committee;

19   3.    a proposal to strengthen the Company's disclosure controls;

20   4.    a proposal to strengthen the Board's supervision of operations and

21   develop and implement procedures for greater shareholder input into the policies and

22   guidelines of the Board; and

23   5.    a provision to permit the shareholders of DreamWorks to nominate at

24   least three candidates for election to the Board;

25   C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity,

26   and state statutory provisions sued hereunder, including attaching, impounding, imposing

27   a constructive trust on, or otherwise restricting the proceeds of defendants' trading

28   activities or their other assets so as to assure that plaintiff on behalf of DreamWorks has

- 30 -

1  an effective remedy;

2          D.      Awarding to DreamWorks restitution from defendants, and each of them,

3  and ordering disgorgement of all profits, benefits, and other compensation obtained by

4  defendants;

5          E.      Awarding to plaintiff the costs and disbursements of the action, including

6  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7          F.      Granting such other and further relief as the Court deems just and proper.

8                                          **JURY DEMAND**

9          Plaintiff demands a trial by jury.

10  Dated: September 4, 2014

                                              ROBBINS ARROYO LLP

12                                            *B Robbins w/permission LK*
                                              _____
13                                            BRIAN J. ROBBINS

14                                            BRIAN J. ROBBINS
                                              CRAIG W. SMITH
15                                            SHANE P. SANDERS
                                              GINA STASSI
16                                            600 B Street, Suite 1900
                                              San Diego, CA 92101
17                                            Telephone: (619) 525-3990
                                              Facsimile: (619) 525-3991
18                                            brobbins@robbinsarroyo.com
                                              csmith@robbinsarroyo.com
19                                            ssanders@robbinsarroyo.com
                                              gstassi@robbinsarroyo.com

20                                            STEPHENS & STEPHENS LLP
                                              CONRAD B. STEPHENS
21                                            505 South McClelland Street
                                              Santa Maria, CA 93454
22                                            Telephone: (805) 922-1951
                                              Facsimile: (805) 922-8013
23                                            conrad@stephensfirm.com

24                                            MORGAN & MORGAN, P.C.
                                              PETER SAFIRSTEIN
25                                            28 West 44th Street, Suite 2001
                                              New York, NY 100136
26                                            Telephone: (212) 564-1637
                                              Facsimile: (212) 273-1128
27                                            psafirstein@morgansecuritieslaw.com

28                                            Attorneys for Plaintiff
   977764

                                              - 31 -

## VERIFICATION

I, Ignacio Moreno, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _9-2-2014_

_____
IGNACIO MORENO